# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

IN THE MATTER OF
THE EXTRADITION OF
NDUE HARUSHA

Case No. 07-x-51072
HON. LAWRENCE P. ZATKOFF

_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on the 9th day of April, 2008.

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This matter is before the Court pursuant to a complaint for the extradition of Ndue Harusha

("Harusha") filed by the United States of America ("Government") at the request of the Republic

of Albania ("Albania"), pursuant to the United States Extradition Treaty with Albania (the

"Treaty").    After the Court scheduled a hearing regarding the extraditability of Harusha, the

Government filed a Memorandum in Support of Extradition and Harusha's counsel filed a

Memorandum on his behalf.  On March 20, 2008, pursuant to 18 U.S.C. §3184, this Court held a

hearing to consider the "evidence of criminality presented."

## II.  BACKGROUND

Albania seeks the extradition of Harusha on charges of murder and attempted murder, which

charges stem from an incident that occurred in Albania in 1995. In 1996, Harusha was convicted of

those crimes (as well as the crime of illegal possession of firearm) in Albania *in absentia,* and he

was sentenced to an aggregate term of 23 years imprisonment.

## A.    Government's Version of Relevant Events

The Government's version of the incident which led to the criminal charges against Harusha is based on affidavits of Albanian prosecutors Perparim Kulluri and Adrian Visha, as well the decision of the Albanian Court of Appeal, Tirane.  The allegations of the prosecutors and the finding of the Court of Appeals Tirane demonstrate the following.  On August 30, 1995, Metish Ujka and Gjon Harusha (Harusha's son) had an argument in a bar in the town of Shkoder, Albania. Metish Ujka also disputed with Harusha at the bar. Artur Ujka, the son of Metish Ujka and an Albanian police officer, was informed of the argument and went to help his father. Artur Ujka then had an altercation with Harusha.  In the course of the argument, Harusha shot and killed Metish Ujka. Harusha also shot Artur Ujka in the stomach. Artur Ujka was seriously injured but survived. Harusha reportedly fled the scene immediately after the shootings.

Artur Ujka provided eyewitness testimony that he saw Harusha commit the shootings. Another eyewitness, Ymer Nika ("Nika"), stated that he saw Harusha leaving the scene with a gun in his hand. Nika described Harusha's clothing and physical appearance, and Nika's descriptions corresponded to the testimony of other witnesses.  Other witnesses placed Harusha at the scene of the shootings, allegedly selling kebabs. Albanian police found three cartridge casings in the place where witnesses saw Harusha standing, but they did not recover a weapon.  A criminal trial was held in the District Court of Shokder in 1996, but Harusha was not present at the trial.  At that trial, Harusha allegedly was provided a defense by a lawyer in accordance with the Albanian Code of Criminal Procedure.  Harusha was found guilty in the District Court of Shokder and that decision was affirmed by the Court of Appeal, Tirane.

**B.      Harusha's Version of Relevant Events**

As discussed below, Albania was embroiled in economic and legal turmoil at the time of the incident.  Harusha claims that he operated a small kiosk selling meat kebabs in front of a bar near his home in an effort to support himself and his family.  Therefore, Harusha claims that the incident did not take place in the bar but outside the bar on the street and that there were many witnesses to the incident.  On the day in question, Metish Ujka approached Harusha's kiosk with Artur Ujka. Metish Ujka and Harusha argued as Metish Ujka attempted to take money from Harusha's cash box. Metish Ujka then allegedly attacked Harusha with a screwdriver, plunging it into Harusha's head twice. Harusha disarmed a passerby and fired at Metish. Artur Ujka (who was not dressed in his police uniform at the time) approached with his gun drawn. Harusha believed Artur Ujka was an attacker, and Harusha fired at him.  Harusha asserts that there were dozens of people on the street who saw the attack and would vouch for Harusha's defense.  After the incident, Harusha states that he sought medical attention for his wounds and remained in his home for the next two years.  Although Harusha came to the United States in 1997 (where he has lived ever since), his wife remained in Albania until 1999.  Harusha claims neither he nor his wife were ever notified of any criminal charges or prosecution against him.  Harusha also states that he was never interviewed by investigators about the incident.

**C.      Reason for Hearing**

Article II of the Treaty provides that murder and attempted murder are extraditable offenses. Subsequent to his convictions, Albania put the Unites States on notice that Harusha had been convicted of such offenses and wanted him detained for purposes of extradition. After Harusha was provisionally arrested in the United States on December 29, 2007 pursuant to such notice, Albania

submitted a formal request for Harusha's arrest, extradition and surrender to the United States Department of State, in compliance with the Treaty. Those documents were filed with this Court on February 29, 2008. The Government, acting on behalf of the requesting country, has the burden of proof and must produce certified authentic documentation which alleges the basis for the request for extradition. A certificate of authenticity from the consular of the United States resident in the requesting country constitutes proof of authenticity. 18 U.S.C. §3190. In this case, Harusha stipulates that the documentation presented by the Government in its filing dated February 29, 2008, has been properly authenticated under the statute.

### III. EXTRADITION PROCEEDING

Under 18 U.S.C. § 3184, a fugitive is entitled to a hearing before a U.S. District Judge or magistrate judge before international extradition is effectuated. The Government must establish that: (1) there is a valid and effective extradition treaty between the United States and the country requesting extradition; (2) under the provisions of said treaty the fugitive may be extradited for the crime charged; (3) the evidence supporting the extradition complaint conforms to the applicable standards mandated by the treaty and/or the laws of the United States; and (4) the evidence supports a finding of probable cause to believe that a crime has been committed and that the person to be extradited committed it. 18 U.S.C. §§3184 and 3190. *See also In re Extradition of Salas*, 161 F.Supp.2d 915 (N.D.Ill. 2001). The Government must also show that the fugitive has not shown, by a preponderance of the evidence, any valid defense to the extradition (as opposed to a defense to the crime). *United States v. Linson*, 88 F.Supp.2d 1123, 1125 (D.C. Guam 2000); *In re Extradition of Howard*, 791 F.Supp. 31, 33 (D. Mass. 1992).

While a district court's examination of the international extradition request is limited, a district court may examine the viability of any defenses to extradition the fugitive may raise. For example, if a treaty permits as much, the fugitive may assert that the crime for which he is accused of committing was of a political nature. *Barapind v. Enomoto*, 360 F.3d. 1061,1073 (9th Cir. 2004). He may also assert that the extradition is in violation of the applicable statute of limitations. *Theron v. U.S. Marshal*, 832 F.2d 492 (9th Cir. 1987), *abrogated on other grounds by Wells v. United States*, 591 U.S. 482 ( 1997). A court must examine such assertions in the context of whether the crime for which the fugitive is accused is extraditable under the applicable treaty and any other applicable laws. *Barapind*, 360 F.3d at 1073 (a conclusion that a crime is a political offense is a determination that the crime does not fall with the terms of the treaty); *Theron*, 832 F.2d at 498 (if a charge is barred by the statute of limitations, then a fugitive is not extraditable on that charge).

"Extradition is an executive rather than a judicial function." *Hoxha v. Levi*, 465 F.3d 554, 560 (3d Cir. 2006). For this reason, a court may conduct only a limited inquiry following a complaint seeking extradition. *Id.* "In an extradition hearing, the court decides whether the fugitive is subject to surrender to the requesting government, a determination that requires a finding as to whether probable cause supports the charges against the defendant." *Id. See also* 18 U.S.C. §3184 (upon a complaint for extradition, a court may consider whether the evidence is "sufficient to sustain the charge under the provisions of the proper treaty or convention"); *In re the Extradition of Drayer*, 190 F.3d 410, 415 (6th Cir. 1999) ("An extradition proceeding is not a forum in which to establish the guilt or innocence of the accused; rather, the sole inquiry is into probable cause.").

If probable cause is satisfied, the judge then makes a finding of extraditability, and the case

is certified to the Secretary of State for further action. *See Hoxha*, 465 F.3d at 560 (affirming certification of extradition of Albanian national and naturalized American citizen convicted of murder *in absentia*). After the Court has completed its "limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender." *Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 829 (11th Cir. 1993). "The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations, which the extradition [judge] may not." *Id.*

## IV. PROCEDURAL REQUIREMENTS IN EXTRADITION HEARINGS

### A. Constitutional Provisions, Rules of Criminal Procedure and Evidence Do Not Apply

The Fourth, Fifth and Sixth Amendments have no application to extradition hearings. *See Neely v. Henkel*, 180 U.S. 109, 122 (1901) (rights available to one charged with criminal offense in the United States not applicable to offenses committed outside the United States against the laws of another country); *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911) ("It is common in extradition cases to attempt to bring to bear all of the factitious niceties of a criminal trial at common law. But it is a waste of time."); *In the Matter of the Extradition of Octavio Rodriguez Ortiz*, 444 F. Supp. 2d 876, 885 (N.D. Ill. 2006) ("[C]onstitutional protections applicable in criminal proceedings have been held inapplicable in the context of extradition."). The process due for a determination of guilt under the foreign law is correctly afforded by the foreign court making that determination. *See Neely*, 180 U.S. at 123. In addition, the Federal Rules of Criminal Procedure and Evidence do not apply. *See* Fed. R. Crim. P. 54(b)(5) ("These rules are not applicable to extradition and rendition of fugitives"); Fed. R. Evid. 1101(d)(3) ("The rules (other than with respect to privileges) do not apply . . . [to p]roceedings for extradition or rendition").

**B.      Government Has Wide Latitude in Submitting Its Evidence**

"Unique rules of wide latitude govern reception of evidence in Section 3184 hearings." *Sayne v. Shipley*, 418 F.2d 679, 685 (C.A. Canal Zone 1969), cert. denied, 398 U.S. 903 (1970). For example, hearsay is permitted and admissible. *Id. See also Collins v. Loisel*, 259 U.S. 309, 317 (1922); *O'Brien v. Rozman*, 554 F.2d 780, 783 (6th Cir. 1977) (affirming extradition of Canadian fugitive wanted for murder where only evidence presented was hearsay); *Hoxha*, 465 F.3d at 561 ("A judge may rely on hearsay evidence in considering whether probable cause is satisfied."). Title 18 U.S.C. § 3190 explicitly enumerates in mandatory terms that a variety of documentary evidence, including "depositions, warrants, or other papers or copies thereof shall be admitted," provided they are "properly and legally authenticated." S*ee also Collins*, 259 U.S. at 313. Accordingly, a finding of extraditability may be based entirely on documentary evidence. *See, e.g., Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *O'Brien*, 554 F.2d at 783. Finally, "physical evidence is not needed and the Court may find probable cause based on documentary evidence and sworn affidavits alone." *See Ortiz*, 444 F. Supp. 2d at 890.

**C.      Harusha's Right to Challenge the Evidence Is Limited**

Because of the limited purpose of an extradition proceeding, the importance of international obligations of the United States agreed to under an extradition treaty, and the inherent practical difficulties in international proceedings, a fugitive's right to challenge the evidence introduced against him is limited. *See Hoxha*, 465 F.3d at 561 ("The range of evidence that a defendant may introduce as to probable cause at an extradition hearing is limited."); *Ortiz*, 444 F. Supp. 2d at 884 ("At an extradition hearing, the defendant's right to challenge the evidence introduced against him is quite limited.")

  *1.  Harusha May Not Contradict the Submitted Evidence, but May Only Explain It*

  A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the demanding state, but he may introduce evidence explaining that evidence. *Collins*, 259 U.S. at 315-17; *Charlton v. Kelly*, 229 U.S. 447, 461 (1913). As the Supreme Court noted in *Collins*, a respondent in extradition proceedings is not entitled to an extensive hearing akin to a trial on the merits:

> If this were recognized as the legal right of the accused in extradition proceedings, it would give him the option of insisting upon a full hearing and trial of his case here; and that might compel the demanding government to produce all its evidence here, both direct and rebutting, in order to meet the defense thus gathered from every quarter. The result would be that the foreign government though entitled by the terms of the treaty to the extradition of the accused for the purpose of a trial where the crime was committed, would be compelled to go into a full trial on the merits in a foreign country, under all the disadvantages of such a situation, and could not obtain extradition until after it had procured a conviction of the accused upon a full and substantial trial here. This would be in plain contravention of the intent and meaning of the extradition treaties.

*Collins*, 259 U.S. 309 at 316 (citations omitted); *In the Matter of the Requested Extradition of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978), *aff'd,* 619 F.2d 167 (2d Cir. 1980) ("The decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits.").

  As a result, "[c]ourts have traditionally distinguished between inadmissible 'contradictory evidence,' which merely conflicts with the government's evidence, and admissible 'explanatory evidence,' which entirely eliminates probable cause." *Hoxha*, 465 F.3d at 561. *See also Ortiz*, 444 F. Supp. 2d at 883 ("[The fugitive] can offer evidence that explains the requesting country's proof, but he cannot submit evidence that contradicts it."); *Sindona*, 450 F. Supp. at 685 ("In admitting

'explanatory evidence,' the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and having some reasonable chance of negating a showing of probable cause.").

> 2. *Harusha May Not Assert Any Affirmative Defenses, Including Self- Defense*

Given that a respondent may only introduce explanatory evidence, it follows that affirmative defenses, including self-defense, are not relevant in extradition hearings and should not be considered. *See Charlton*, 229 U.S. at 462 (finding that evidence of an insanity defense "should be heard at the time of his trial, or by a preliminary hearing in the jurisdiction of the crime, if so provided by its laws"); *Collins*, 259 U.S. at 316-317.

> 3. *Rule of Non-Inquiry*

"Under the rule of non-inquiry, courts refrain from investigating the fairness of a requesting nation's justice system, and from inquiring into the procedures or treatment which await a surrendered fugitive in the requesting country." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir.1997). "The non-inquiry principle serves interests of international comity by relegating to political actors the sensitive foreign policy judgments that are often involved in the question of whether to refuse an extradition request." *Hoxha*, 465 F.3d at 563. *See also Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005) ("Once the ... judge determines that the crime is extraditable and there is probable cause to sustain the charge, it is the Secretary of State, representing the executive branch, who determines whether to surrender the fugitive."); *In re Gonzalez*, 217 F.Supp. 717, 722 n. 15 (S.D.N.Y. 1963) (extradition court has no authority to inquire into matters other than the facial validity of the extradition documents).

## V. ANALYSIS

An extradition certification is in order where: (1) the judicial officer has jurisdiction; (2) the offense charged is within the treaty; and (3) there is competent legal evidence to support a finding of probable cause as to each charge for which extradition is sought. *See Fernandez v. Phillips*, 268 U.S. 311, 312 (1925). The Court finds that each of the factors favors granting Albania's request for extradition in this case.

### A.      This Court Has Jurisdiction.

This Court has subject matter jurisdiction pursuant to 18 U.S.C. §3184. Personal jurisdiction exists because Harusha is located in this district. *See Ortiz*, 444 F. Supp. 2d at 880. The Court also notes that Harusha admits that he is the person sought by Albania for extradition and that the Court has jurisdiction over him to conduct the extradition hearings.

### B.      The Offenses Charged Are Covered by the Treaty.

Peter A. Gutherie, an Attorney Adviser in the Office of the Legal Adviser for the Department of State in Washington, D.C., has submitted a Declaration to the Court, wherein he verifies that the Treaty is presently in full force and effect. *See also Hoxha*, 465 F.3d at 562-63 ("[W]e conclude that the extradition treaty between Albania and the United States remains valid[.]"). The crimes of murder and attempted murder are covered by the Treaty. See Treaty, Art. II, ¶¶1, 26. In addition, Harusha acknowledges that the Treaty is valid and that the charges of murder and attempted murder are extraditable offenses.

### C.      There Is Probable Cause to Sustain the Charges.

The paramount issue of every extradition proceeding is probable cause, and that is a court's

"sole inquiry." *Drayer*, 190 F.3d at 415. "The probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings." *See Hoxha*, 465 F.3d at 561. *See also Ortiz*, 444 F. Supp. 2d at 883-84 ("The assessment to be made is similar to the one in a preliminary hearing under the Federal Rule of Criminal Procedure 5.1."). Thus, a judge's role is "to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Hoxha*, 465 F.3d at 561.[1]

The evidence that the Government (on behalf of Albania) submitted in support of extradition consists of the affidavits of Albanian prosecutors summarizing the testimony of eyewitnesses, as corroborated by other evidence. That evidence shows that Harusha had a dispute with Metish Ujka and Artur Ujka. In the course of the argument, Harusha shot and killed Metish Ujka, and shot and seriously injured Artur Ujka. The evidence also includes a description of eyewitness testimony of one of the victims, Artur Ujka. The evidence also includes another eyewitness account, that of Nika, who has no known relationship to Harusha or the victims. Nika saw Harusha leaving the scene with a gun in his hand. Nika described Harusha's clothing and physical appearance, and his description apparently corresponded to the testimony of other witnesses who placed Harusha at the scene of the shooting. Finally, police found three cartridge casings in the place where witnesses saw Harusha standing.

The foregoing evidence, which in the limited context of an extradition hearing must be accepted, is more than sufficient to establish probable cause that Harusha murdered Metish Ujka and

---

[1]Proof of a conviction gained *in absentia* does not constitute probable cause. The court must still scrutinize the evidence to determine if there is a reasonable probability that the respondent committed the crime. *United States v. Fernandez-Morris*, 99 F.Supp.2d 1358, 1365 (S. D. Fla. 1999).

attempted to murder Artur Ujka. The fact that Harusha admits shooting Metish and Artur Ujka eliminates any question of "whether there is competent evidence to justify holding the accused to await trial[.]" *See Hoxha*, 465 F.3d at 561. Again, the Court notes that its role is not to determine, and the Court does not offer any opinion as to, whether the evidence is sufficient to justify *convicting* Harusha of murder or attempted murder.

**D.** **Arguments of Harusha**

    *1.*    *Missing Documents*

In this case, Harusha contests his extradition on a number of grounds. Harusha first argues that the Government failed to submit documentation required under the Treaty, namely an authenticated copy of the sentence rendered by the District Court of Shkoder. Harusha argues that Article XI of the Treaty provides that if the fugitive is being surrendered after he has been *convicted* of a crime, an authenticated copy of the judgment of the court before which such conviction took place shall be produced. In addition, if the crime is merely charged and there is no conviction, a duly authenticated copy of the warrant of arrest in the country where the crime was committed shall be produced.

It is undisputed that the Government has not produced an authenticated copy of the sentence rendered by the District Court of Shkoder or the arrest warrant in this case. As the United States Supreme Court has held, however, the requirement of authenticated documents under a treaty falls within the "requirements" that Congress has waived. *See Grin v. Shine*, 187 U.S. 181, 191 (1902); *Charlton v. Kelly*, 229 U.S. 447 (1913). Among other issues in *Grin*, the accused claimed that a treaty with Russia required "an authenticated copy of arrest or some other equivalent judicial document, issued by a judge or magistrate of a foreign government duly

authorized so to do, and that there is no such process in the record as a warrant of arrest or its equivalent." Despite this requirement, the Supreme Court stated:

> But there is another consideration in this connection which should not be overlooked. While the treaty contemplates the production of a copy of a warrant of arrest or other equivalent document, issued by a magistrate of the Russian Empire, it is within the power of Congress to dispense with this requirement, and we think it has done so by Rev. Stat. § 5270 [U.S. Comp. Stat. 1901, p. 3591], hereinbefore cited. The treaty is undoubtedly obligatory upon both powers, and, if Congress should prescribe additional formalities than those required by the treaty, it might become the subject of complaint by the Russian government and of further negotiations. But notwithstanding such treaty, Congress has a perfect right to provide for the extradition of criminals in its own way, with or without a treaty to that effect, and to declare that foreign criminals shall be surrendered upon such proofs of criminality as it may judge sufficient. *Castro v. De Uriarte*, 16 Fed. 93. This appears to have been the objective of § 5270 [U.S. Comp. Stat. 1901, p. 3591], which is applicable to all foreign governments with which we have treaties of extradition. The requirements of that section, as already observed, are simply a complaint under oath, a warrant of arrest, evidence of criminality sufficient to sustain the charge under provisions of the proper treaty or convention, a certificate by the magistrate of such evidence and his conclusions thereon, to the Secretary of State. As no mention here is made of a warrant of arrest, or other equivalent document, issued by a foreign magistrate, we do not see the necessity of its production. This is one of the requirements of the treaty which Congress has intentionally waived. Moore, Extradition, § 70.

*Grin,*, 187 U.S. at 191.

Section 5270 is the predecessor statute to 18 U.S.C. § 3184, the statue pursuant to which this action is being prosecuted. Like Section 5270, Section 3184 does not require an authenticated copy of a warrant of arrest and/or authenticated copy of the conviction and sentence of Harusha. Section 3184 states, in relevant part:

> Whenever there is a treaty or convention for extradition between the United States and any foreign government, . . . any justice or judge of the United States, . . . may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, . . .issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of such criminality may be heard and considered. . . . If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, . . . he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender is made.

In this case, a complaint under oath has been filed and Harusha has been apprehended. Accordingly, what remains for this Court is determine whether "the evidence [is] sufficient to sustain the charge under the provisions of the" Treaty. In other words, this Court's duty is limited to making a determination whether probable cause exists to try Harusha for the charges for which he is to be extradited (murder and attempted murder), which duty the Court has fulfilled as described above. As *Grin* demonstrates, however, the Court's duty is not conditioned on the Government's submission of an authenticated copy of Harusha's sentence and conviction or warrant of arrest.

2.     *Due Process Violations*

Harusha argues that the Government's request for extradition must fail under the Treaty because Harusha's conviction was obtained in contravention of Albanian law, namely that there

were numerous due process violations.  The alleged due process violations include:

a.    Not being informed of the criminal proceedings against him, in violation of Article 37 of the 1993 Albanian constitution, which provides that "During criminal proceedings, no one may be deprived of the right: (a) to be informed at once and in detail of the accusation..."

b.    Being convicted of the criminal charges *in absentia*, in violation of Article 36 of the 1993 Albanian constitution, which provided that "No one may be convicted unless he is present in court."

c.    Not being afforded effective counsel, stating that the record is silent as to: (1) who this counsel was, (2) any defense that was presented, or (3) whether counsel even raised the constitutional violations of lack of notice and that Harusha was tried *in absentia*.

As discussed above, however, the rule of non-inquiry precludes this Court from conducting an analysis of due process violations in the Albanian system. *See Kin-Hong, supra; Hoxha, supra.*

*See also Fernandez-Morris*, 99 F.Supp.2d at 1370:

> The Supreme Court has held that where extradition is sought pursuant to a valid treaty, a petitioner cannot prevent extradition simply by alleging that the criminal process he will receive in the foreign country fails to accord with constitutional guarantees. ... In general, ... those arguments or concerns are most appropriately addressed by the Department of State.  The Department of State has the discretion to deny extradition on humanitarian grounds, if it should appear that it would be unsafe to surrender a person to foreign authorities.

The Court also notes the representations of the Government regarding the due process concerns in this matter.  Specifically, the Government has represented to this Court that because of the *in absentia* nature of Harusha's convictions, the United States Department of State has informed Government counsel that, prior to issuing a surrender warrant, the United States Department of State will seek diplomatic assurances from Albania that Harusha will receive a new trial in accordance with Albanian criminal procedure.  Moreover, the United States Department of State has indicated

that it would consider Albania's response to that request in determining whether to surrender Harusha to Albania.

### 3. *Political Offenses*

The Treaty includes a political offense exception in Article III, which states that "...no person surrendered by or to either of the High Contracting parties in virtue of this treaty shall be tried or punished for a political crime...."  Article III continues: "The State applied to, or the courts of such State, shall decide whether the crime of offense is of a political character."  Article III thus allows a district court discretion in determining whether a crime is a political offense. *See, e.g.*, *Ornelas v. Ruiz*, 161 U.S. 502 (1896); *Eain v. Wilkes*, 641 F.2d 504 (7th Cir. 1981).

In support of his claim that he may not be extradited because he would be tried or punished for a political crime, Harusha cites the conditions in Albania at the time of the incident at issue.  According to the United States Department of State Bureau of European and Eurasian Affairs,[2] the "Republic of Albania" is a fairly recent democratic republic  born  of extensive turmoil during a decade-long period of reformation that took place from 1990-2000.  After World War II, the nation fell under communist rule and was led by Prime Minister Enver Hoxha ("Hoxha").  Hoxha, the Communist Party leader, established a socialist government in an effort to unify the nation, secure and maintain its borders and establish a pure Stalinist system of government.  Hoxha enforced the communist party line with a state security force known as the *Sigurimi*, a national police force that conducted raids, searching homes, and arresting or beating

---

[2] The information contained herein is taken from the United States Department of State Bureau of European and Eurasian Affairs reports:  2007 Background Note on Albania;  Reports on Albanian Human Rights Practices for the years 1993, 1996, 1998,  2001 and 2006.

suspects. While under communist rule, Albania surprisingly was able to achieve major industrial and agricultural growth, however, the country became increasingly isolated under the strict communist regime.

In 1985, the death of Hoxha and protests against the segregation under the communist system of government brought a wave of reform under Hoxha's successor. Six years later, communism completely collapsed in Albania. A democratic form of government was embraced, and a bilateral democratic parliamentary government was established. In 1992, the first democratically elected President, Sali Berisha ("Berisha"), took power of the struggling nation. While the nation made efforts to move from a centralized, government-controlled economic and legislative system, the nation struggled immensely to realize democracy. The collapse of the communist regime brought with it harsh economic instability as Albania's isolation from its former allies and geographic neighbors severely hampered free trade. As a result, Albania was the poorest of the Balkan nations.

A year after Berisha was elected, the nation ratified his draft constitution. The "Berisha constitution" (a/k/a the "1993 constitution") was an effort to provide democratic reforms in human rights and establish the rule of law for a nation that was ravaged by internal conflict, corruption, and civil war. The Berisha constitution provided for an independent judicial branch, including a three tiered court system comprised of the Court of First Instance (District Courts), the Courts of Appeals, and the Court of Cassation (Supreme Court). Each court was divided into three divisions: criminal, civil and military. In addition, Article 31 of the 1993 Albanian constitution provided that "No one shall be deprived of his right to a fair, public and speedy

hearing by a competent, independent, and impartial court."

While the Berisha constitution provided certain rights, due to internal degradation, abuse of power, intimidation and political in-fighting, the judiciary was rife with corruption and unable to function independently. The resulting in-fighting and political ruthlessness threw the country into legal turmoil. As part of the reform, the *Sigurimi* became the National Intelligence Service responsible for both external and domestic intelligence collection. Nonetheless, internal corruption continued to infect law enforcement. Allegations of police corruption and abuse abounded. Vigilante and organized crime flourished.

In 1998, the government made new efforts to stabilize. Forging new trade agreements brought hope for economic revival. A new constitution was ratified by the nation and new elections were held. Berisha, formerly the President, was now installed as Prime Minister. The new constitution expanded civil rights protections and abrogated the 1993 Berisha constitution. Under the new constitution, Article 29 provided "No punishment may be given that is more severe than that which was contemplated by law at the time of commission of the criminal act."

During this decade of turmoil, the homicide of Metish Ujka and shooting of Artur Ujka occurred. It was also during this time that Harusha was accused, tried and convicted *in absentia* of the murder and attempted murder charges that have resulted in the request for Harusha's extradition. The political turmoil of Albania, however, does not, in itself, demonstrate that Harusha was tried and convicted, or will be tried, for any political reason. Courts in the United States have generally recognized political offense exceptions in two instances: (1) "pure political offenses" involving treason, espionage, sedition and other acts that do not violate the rights of

individual citizens; and (2) "relative political offenses," which include acts committed in the course of, and incidental to, a violent political disturbance such as war. *See Ornelas*, 161 U.S. at 511; *Eain*, 641 F.2d at 512, 518.

Harusha has not offered any evidence or explanation of how the shootings in this case involved pure or relative political offenses or stem from acts which would support a finding of such offenses. Harusha apparently believes that because Artur Ujka was an Albania State Police officer, he was therefore a former member of the *Sigurimi*. There is no evidence of this in the record, and there is no indication that the shooting resulted from any police activity or political turmoil. Moreover, even if Artur Ujka was an Albanian police officer or member if *Sigurimi*, there is no suggestion he was acting in a professional capacity when the incident occurred. Rather, regardless of whose version is considered, the shootings resulted from a dispute between Harusha (and his son) and the Ujkas about whether Metish Ujka stole money from Harusha and/or his son. There is no indication that the dispute involved any kind of political uprising.

Accordingly, the Court concludes that there is no evidence that Harusha has been or will be subject to a political charge based on the information on the record.

**E.     Request for Conditional Extradition**

In the interest of justice and in light of the manner of Harusha's conviction in 1996, the Court feels compelled to comment on the request for extradition of Harusha. Counsel for the Government stated that the United States Department of State will be seeking assurances from the Albanian government that Harusha be given a new trial in the event he is extradited to Albania. For the following reasons, the Court believes that Harusha's extradition under the Treaty should be conditioned on assurances that Harusha be given a new trial in Albania.

First, a conviction *in absentia* is contrary to not only the Constitution of the United States, but it also appears to violate the 1993 Albanian constitution that was in effect at the time that Harusha was tried and convicted for the murder and attempted murder of Metish Ujka and Artur Ujka, respectively.  Second, there is no indication of the name of the counsel "appointed" to represent Harusha in the criminal proceeding against him there, nor is there any indication that any violation of due process arguments were raised by such counsel in the District Court of Shkoder or the Court of Appeals Tirane (the decision of the Court of Appeals Tirane does not reference any such arguments).  Third, Harusha indicates, and no evidence suggests otherwise, that he was in Albania for two years following the incident (and his wife was there for two more years after that).  Despite that, there is no indication that Harusha was notified of the charges against him or interviewed about the incident.  The Court recognizes that just because a defendant has such rights in the United States, such rights are not automatically afforded persons in other countries.  In this case, however, the 1993 Albania Constitution certainly appears to bestow some or all of the foregoing rights to an accused.  Finally, the language of 18 U.S.C. §3185 supports such a conditional extradition (emphasis added):

> such person shall be returned and surrendered to the authorities in control of such foreign country or territory on the order of the Secretary of State of the United States, and **such authorities shall secure to such a person a fair and impartial trial**.

This Court therefore urges the United States Department of State to honor the representations it has made to this Court through counsel for the Government and obtain assurances from the Albanian government that Harusha be granted a new trial before Harusha is surrendered to Albania pursuant to the Treaty.

## VI. CONCLUSION

For all of the forgoing reasons, the Court CERTIFIES that Harusha is extraditable and refers this matter to the United States Secretary of State for its determination whether to surrender Harusha to authorities in Albania.  The Court also ORDERS that Harusha remain detained in the custody of the United States Marshal Service pending the United States Secretary of State's determination whether to grant Albania's request for extradition.

IT IS SO ORDERED.


s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  April 9, 2008

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on April 9, 2008.


s/Marie E. Verlinde
Case Manager
(810) 984-3290